[No. 14761. Department Two. December 9, 1918.]

# THE STATE OF WASHINGTON, *Respondent*, v. CHARLES A. PALMER, *Appellant*.[1]

HOMICIDE (5, 6)—MANSLAUGHTER—ELEMENTS—KILLING WITH DESIGN—STATUTES. Under Rem. Code, §§ 2392-2395, defining murder in the first degree as the killing with premeditated design to effect the death of the person killed, murder in the second degree as the killing with such design but without premeditation, and manslaughter as every other killing not excusable or justifiable, killing with a design to effect death is murder and the element of manslaughter is excluded, even if under provocation or sudden heat of passion.

SAME (118) — TRIAL — INSTRUCTIONS — GRADE OR DEGREE — MANSLAUGHTER. Under a plea of self-defense, admitting that the killing was with a design to kill, the accused is guilty of murder or not guilty and is not entitled to an instruction on the subject of manslaughter, as defined by Rem. Code, § 2395.

SAME (94, 121)—TRIAL—ABSENCE OF EVIDENCE OF MANSLAUGHTER. On a plea of self-defense, accused is not entitled to an instruction on the subject of manslaughter, where there was no evidence to show facts within the statutory definition of manslaughter.

CRIMINAL LAW (316) — TRIAL — INSTRUCTIONS ALREADY GIVEN. Error cannot be assigned upon the refusal of requested instructions where the instructions given fairly covered the subject.

SAME (255)—TRIAL—INSTRUCTIONS—COMMENT ON EVIDENCE. In a prosecution for murder, a request to instruct the jury to consider the intoxicated condition of the deceased at the time he was shot, as bearing upon the weight to be given to his dying declaration made three days later, is properly refused as a comment on the evidence.

HOMICIDE (46)—EVIDENCE—ADMISSIBILITY—OTHER OFFENSE. In a prosecution for murder, in which the testimony necessarily showed that two persons had been shot and had subsequently died and the jury was thoroughly familiar with the fact, it is not error to refuse to strike the testimony of the killing of the second victim.

SAME (48). In a prosecution for murder, in which it appears that two persons were shot by the accused, evidence as to the wounds on the body of the second victim, for whose killing accused had been acquitted, may have been competent as to the direction of the shots fired by accused.

[1]Reported in 176 Pac. 547.

CRIMINAL LAW (448)—APPEAL—HARMLESS ERROR—RECEPTION OF EVIDENCE. Error of a harmless nature in the reception of evidence in a murder case does not justify a reversal.

HOMICIDE (67)—EVIDENCE—ADMISSIBILITY — DYING DECLARATIONS —ATTENDING CIRCUMSTANCES. Oral testimony of the circumstances under which a dying declaration, taken down and subscribed in due form when made, is admissible as explanatory.

SAME (62)—EVIDENCE—ADMISSIBILITY — PREVIOUS THREATS—REMOTENESS. Upon an issue of self-defense, evidence of threats against the accused made ten years before, and testified to by a witness who had not lived in the neighborhood for seven years, are too ancient to be admissible.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered October 23, 1917, upon a trial and conviction of murder in the second degree. Affirmed.

*Del Cary Smith, C. T. McDonald,* and *Geo. F. Cowan, Jr.,* for appellant.

*John B. White* and *Joseph B. Lindsley,* for respondent.

MACKINTOSH, J.—The jury, trying the appellant on an information charging him with the commission of the crime of murder in the first degree, returned a verdict of murder in the second degree, after having presented for its consideration testimony on behalf of the appellant in support of his plea of self-defense.

On March 26, 1917, at the town of Milan, in Spokane county, the appellant shot and killed Nels Verback. Several persons, among whom was the deceased, had congregated at a pool hall, where they had been drinking diluted alcohol, and one of them, the fifteen-year old son of the deceased, had become hopelessly intoxicated, and was lying on the floor behind a billiard table. At about seven o'clock in the evening, the appellant entered the pool hall, of which he was the rental agent, and after viewing the situation there,

came out and made some remarks about the condition of the boy, and started to leave, when he was seized by one of the party. He demanded that he be released, which was done. The appellant then turned around and fired three shots, resulting in the death of Nels Verback and one of his sons.

The appellant's evidence tended to establish, that, after having entered the pool hall and making some remark that it was wrong to give liquor to a boy, he started to come out, when one of the party entered into a more or less acrimonious discussion with him, and struck at him; that another man grabbed the appellant from behind and pinioned his arms to his sides; that thereupon several other persons grabbed the appellant; that the deceased reached around a post, took the appellant by the neck, and commenced to choke him; that several of the party had hold of him by this time, and all of them were apparently trying to get their hands on him, and that he was struck four or five blows on the head; that, while being choked and struck, the appellant managed to get his hand to his hip pocket, and pulled out a revolver and fired.

The appellant had resided in the town of Milan for more than ten years prior to the time of the killing, and had been justice of the peace and a special deputy sheriff. He believed that certain persons in the town had a grudge against him and had threatened to do him bodily harm. While justice of the peace, some ten years before the shooting, he had formed the habit of carrying a loaded revolver and he was so armed at the time he entered the pool hall.

All of the state's witnesses denied that there was any attempt to approach or lay hands on the appellant, except by one of the party, who at one time caught hold of the appellant, but immediately released him, and thereupon the appellant stepped back and

shot the two men. As already noted, the appellant sought to justify the homicide on the ground that it was committed in self-defense.

I. The principal reason urged for the granting of a new trial is that the court did not submit to the jury instructions upon the crime of manslaughter, but withdrew that degree of homicide from the issues in the case. This raises for our consideration the definition of manslaughter as that crime now exists in this state.

The appellant concedes that, unless the facts warrant an instruction upon manslaughter, it would have been error to have given such an instruction, and that the crime of manslaughter is not necessarily included within the charge of murder. This has been held so often by this court that it is not necessary to recite the long list of cases to that effect.

Volumes have been written upon the distinctions between murder in the first degree, murder in the second degree, and manslaughter; and it is probably true that no branch of the criminal law has been more exhaustively treated in both decisions and text books. But these are all of little assistance to us, in view of the peculiar statute in this state. So far as our research has carried us, we have been unable to find that any state in the Union has attempted to define the degrees of murder and manslaughter exactly as our statute defines them. It is true that the framers of our criminal code of 1909 lifted from the code of New York the sections defining murder in the first and second degrees and manslaughter. But, like many purloiners of other people's property, they did not succeed in taking with them all the accessories to the parts which they appropriated.

The New York code, after defining manslaughter as it is defined in § 2395 of Remington's Code, to wit: "In any case other than those specified in sections

2392, 2393, and 2394 [being murder in the first degree, murder in the second degree, and killing in duel], homicide, not being excusable or justifiable, is manslaughter,'' proceeds and enumerates the degrees of manslaughter, and provides, among other things, that homicide, when committed without design to effect death, in the heat of passion, shall constitute manslaughter. These sections are omitted from our code.

At common law and under our statute, up to the time of the passing of the new criminal code in 1909, as far as the matter before us is concerned, murder in the first degree was the killing purposely and of deliberate and premeditated malice. Murder in the second degree was the killing purposely and maliciously, but without deliberation and premeditation. And manslaughter was the unlawful killing ''without malice, express or implied, either voluntarily upon a sudden heat, or involuntarily, but in the commission of some unlawful act.''

The code of 1909 defined murder in the first degree as the killing with premeditated design to effect the death of the person killed. Murder in the second degree is defined as the killing committed with the design to effect the death of the person killed, but without premeditation. And manslaughter was every other killing not being excusable or justifiable.

It would seem from this that the voluntary killing upon sudden heat, which was formerly included in the crime of manslaughter, has been taken out of that classification by the act, and, as the law now stands, every killing which is accompanied by a design to kill is either murder in the first degree or murder in the second degree, depending upon whether that design was or was not accompanied by premeditation. No longer is the intentional killing upon sudden heat, or the intentional killing, no matter how provoked,

classified as manslaughter. And as soon as it appears that the killing was with a design to effect death, the element of manslaughter disappears from the case. That grade of homicide is characterized by the fact that the one guilty of it possessed no design to kill. If the purpose to kill is present, the offense must be murder in one of its degrees.

*People v. Beckwith,* 103 N. Y. 360, 8 N. E. 662. Manslaughter, as it now stands on our statutes, comprises those undesigned killings committed in the commission of some unlawful act which are not excusable or justifiable.

In this condition of the law, two reasons are shown by the record in this case why the appellant was not entitled to an instruction upon the crime of manslaughter. The first of these is that, by his plea of self-defense and his statement of his purpose, he admitted that the killing was with a design to kill; but he attempted to justify it upon the ground that he reasonably apprehended great personal injury to himself, and that there was imminent danger of such injury being perpetrated; or that he killed in the actual resistance of an attempt to commit a felony upon him. By this plea, having admitted that he shot with the design to effect the death of the deceased, he was, on his own theory, either guilty of murder in the second degree or not guilty. The other reason why the instruction was properly refused is this: Admitting that the defendant might be entitled to an instruction as to manslaughter where he had entered a plea of self-defense, upon the production of testimony which might show facts within the definition of manslaughter, a careful reading of the statement of facts reveals no such testimony. There is evidence which shows that the homicidal act was done under the influence of passion produced by provocation; and at

common law this would have constituted manslaughter, Chief Justice Shaw saying in *Commonwealth v. Webster*, 5 Cush. (59 Mass.) 295, 52 Am. Dec. 711:

"Manslaughter is the unlawful killing of another without malice; and may be voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation, which in tenderness for the frailty of human nature, the law considers sufficient to palliate the criminality of the offence."

The makers of our criminal code having steeled themselves against the feeling of tenderness for the frailty of human nature, no longer palliate the offense, and all killings not excusable or justifiable, done with a design to effect death, constitute murder in one of its degrees. Whether this was a wise and salutary step away from the long established and well understood classification at common law is not for us to inquire. It is an expression of the legislative will upon this subject, and the remedy for the defect, if it be a defect, exists with the legislature and not with the court.

II. Refusal of requested instruction as to prior threats and ill-feeling against the appellant.

III. Refusal of requested instruction as to the drunken condition of the persons whom the appellant claimed assaulted him at the time of the shooting.

The substance of the instructions requested as to prior threats and ill-feeling was contained in instruction number ten as given by the court. And that instruction also fairly covers the matters requested in the instruction in regard to the intoxicated condition of the persons present at the time of the shooting.

IV. Refusal of requested instruction as to dying declaration, and the giving of one by the court on the same subject. The instruction as to the weight to be

given a dying declaration followed the rule established in *State v. Eddon,* 8 Wash. 292, 36 Pac. 139, and while not as elaborate a statement as the one requested by the appellant, correctly and fully covered the subject.

V.  Refusal of requested instruction as to the taking into account of the intoxicated condition of the deceased at the time of the shooting, as bearing upon the weight to be given to his dying declaration made some three days thereafter.

The evidence discloses that the deceased, for some time prior to the shooting, had been drinking diluted alcohol, and was in a more or less intoxicated condition at the time the altercation occurred.  The appellant insists that he was entitled to have the jury instructed that, in weighing the dying declaration of a person made under such circumstances, they should take into consideration the intoxication of the deceased at the time he was shot by the appellant's bullet, as affecting the likelihood of his later reliably knowing or recollecting what occurred at that time.  As we view it, this requested instruction partook largely of a comment upon the evidence in the case, and on that ground was properly rejected.  As we have recently held in *State v. Smith,* 103 Wash. 267, 174 Pac. 9, cautionary instructions to juries, singling out certain classes of witnesses or classes of testimony, and warning them to view with suspicion or extreme care such testimony, are not to be encouraged.  It is proper matter for argument to the jury to call upon their common experience, and warn them against the too easy reception of testimony from certain sources, or given under certain conditions.  But under our law, which prohibits the instruction of the jury by the court upon questions of fact, it is hardly proper for the court to indulge in the practice of pointing out weaknesses in the testimony.

VI. Refusal to strike testimony relating to the killing of the second victim of the appellant's shots.

The testimony in the case necessarily showed that two persons had been shot and had subsequently died. This testimony had, of course, appeared in numerous ways, and necessarily appeared in numerous ways during the trial, and the jury was thoroughly familiar with that fact.

The appellant complains that the testimony of the coroner as to the wounds on the body of the second victim, for whose killing the appellant had already been acquitted, should have been excluded. This testimony might have been admissible as to the direction of the shots fired by the appellant, had that been a material inquiry in the case. From the record we are unable to satisfactorily determine whether that was a material matter or not. But in any event, the reception of this evidence, if error, was of a harmless nature and does not justify a reversal of the case.

VII. The admission of oral testimony relating to the dying declaration.

This dying declaration was prepared by a witness present at the bedside, who wrote down the statement as it was made; he then read it over to the declarant, who there and then subscribed and swore to it. This statement was taken in the form of an affidavit in narrative form, although it had been elicited by questions. This was a proper form in which to submit the dying declaration to the jury. 1 R. C. L. 543. The oral evidence objected to referred to the circumstances under which the declaration was made, and gave the setting, and was properly admitted as explanatory of the circumstances and surroundings.

VIII. Exclusion of testimony as to threats against the appellant made by certain parties involved in the altercation out of which the killing arose.

These threats, which were excluded, referred to incidents occurring ten years before the shooting, and proof of them was offered through a witness who had not resided in the vicinity for seven years. It takes no argument to demonstrate that these threats were too ancient to be admissible.

Being satisfied that, under both the law and the facts, the appellant has had a proper trial, the judgment is affirmed.

MAIN, C. J., HOLCOMB, and MOUNT, JJ., concur.