44 P.3d 1180

STATE of Idaho, Plaintiff–Respondent,

v.

Kody Shane BUTCHER, Defendant–Appellant.

No. 24556.

Court of Appeals of Idaho.

Jan. 14, 2002.

Rehearing Denied Feb. 20, 2002.

Review Denied April 25, 2002.

Randy J. Stoker, Twin Falls, for appellant.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

SCHWARTZMAN, Chief Judge.

Kody Shane Butcher appeals from his conviction for first degree murder. He argues that the district court erred in denying his motion to suppress, in evidentiary rulings, in

instructing the jury, and in denying his motion for a new trial. He also appeals his sentence of life imprisonment without possibility of parole as excessive. We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 10, 1996, at about 4:00 a.m., two men arrived at the home of Blake Morgan in Rupert. The men kicked in the front door and fired three rounds into Blake Morgan's head and neck, killing him. The two men then fled in a gray two-tone van, as observed by a neighbor drawn to his window by the sound of gunshots.

A few days later, Twin Falls Police Officer Steve Benkula stopped a van matching the description of a vehicle used in an immediately preceding armed robbery. Officer Benkula's investigation led to the discovery of firearms in the van, including a nine-millimeter semi-automatic pistol, and the arrest of the driver, Jesus Flores Diaz, Jr., and his passenger Butcher.

Butcher and Diaz were each charged with first degree murder for the shooting death of Morgan. Counsel for Butcher filed a motion for a more definite statement, asserting that the complaint could be read as charging Butcher with murder as a co-conspirator, a principal or an aider and abettor, and sought to force the state to elect one theory only. The magistrate granted the motion for a more definite statement on the state's assertion that they would file an amended complaint electing a specific theory on which to proceed against Butcher and his co-defendant. Later, after a number of amended complaints were filed, and more defense motions seeking to prevent the state from charging Butcher in the alternative, the magistrate accepted the state's argument that I.C. § 18–204 abolished any distinction between principals and aiders and abettors and thus the state was not required to elect one theory over the other.

The magistrate permitted the state to proceed to the preliminary hearing charging Butcher with first degree murder as a principal for shooting Morgan and, alternatively, as a principal for aiding and abetting Diaz in the shooting of Morgan. Following the preliminary hearing, Butcher was arraigned in the district court. Butcher filed a motion to suppress, which the district court denied following a hearing.

At trial, the state's evidence consisted of the following: A neighbor of Morgan testified that on April 10, at about 4:00 a.m., he heard three or four gunshots. Drawn to his window by the sound, he observed a gray Chevy Astro van drive away with its lights off. Another neighbor observed a two-tone gray van with two persons inside drive towards Morgan's house at about 3:50 a.m., heard three "firecrackers," and then saw the van drive past again with its headlights off. The state also presented evidence that a Budweiser beer bottle with Butcher's fingerprint on it was found on Morgan's well-groomed front yard immediately after police responded to the shooting. Officer Benkula testified about the initial stop of Diaz's van and the firearms found within. Forensics experts testified that one of the guns Officer Benkula recovered was a "most probable" ballistic match to the bullets that killed Morgan and that a pair of Nike shoes recovered from Diaz's home matched the shoe prints on Morgan's front door. A state investigator, Special Agent Stuart Robinson, testified that he *Mirandized* and interviewed Butcher. He testified that when he told Butcher that he had been seen outside Morgan's house at the time of the shooting, Butcher responded, "Yes, they probably did." Todd Maas, a jailhouse informant, testified that he and Butcher shared a cell and that Butcher told him that he was caught in possession of a nine-millimeter handgun that was used in the murder of Morgan. Maas claimed that Butcher said he did collections, intimidation, and murder for a drug dealer by the name of Gilbert Rodriguez and threatened to kill Maas if he told anyone about his work. The state then rested its case.

Counsel for Butcher made a motion for a judgment of acquittal, which the district court denied. In Butcher's defense, counsel argued that Rodriguez and Diaz committed the murder. Butcher presented testimony from several jail inmates and a detective to

demonstrate that Maas was a known snitch, a liar, and biased against Butcher. Ronald Eckley testified that he saw Rodriguez and Diaz on the night of April 9 at the Office Bar in Paul and that Rodriguez flashed a chrome nine-millimeter handgun and said, "If they mess with me, I'll take care of them." A forensic expert, Dr. Brady, opined that, based upon his review of the autopsy report, a .357 magnum bullet caused one of the wounds. Counsel for Butcher called Michael Wiggins to testify to a statement by Morgan that Diaz and Rodriguez wanted to kill him, but the district court ruled that Wiggins' testimony was not admissible to show a dying declaration by Morgan or to show Morgan's state of mind or present sense impression. Counsel made an offer of proof as to Wiggins' testimony.

On rebuttal, the state presented the testimony of Jennifer Ploof, a waitress at the Office Bar. Ploof testified that she saw Butcher at the bar with four or five Hispanic men and a couple on the night of April 9, 1996. Additionally, a surveillance video of Rodriguez's home was shown to the jury, which apparently showed a number of non-Hispanic males, including one the state believed to be Butcher, going in and out of the house.

Butcher was found guilty of first degree murder. Counsel for Butcher filed a motion for a new trial, arguing that the jury instructions had been confusing as shown by the jury's questions to the court during deliberations and that newly discovered evidence showed Maas was a liar. Following a hearing on Butcher's motion for a new trial, the district court denied the motion. At sentencing, the district court imposed a determinate life sentence. Butcher appeals.

## II.

### THE DISTRICT COURT'S DENIAL OF BUTCHER'S MOTION TO SUPPRESS

#### A. Standard Of Review

In reviewing a trial court's ruling on a motion to suppress, we employ a bifurcated standard. *State v. Abeyta*, 131 Idaho 704, 708, 963 P.2d 387, 391 (Ct.App.1998).

We accept the trial court's findings of fact that are supported by substantial evidence and freely review the application of constitutional principles to the facts as found. *Id.* The determination of whether a search is reasonable under the Fourth Amendment is a question of law over which we exercise free review. *State v. McIntee*, 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App.1993).

#### B. Discussion

##### 1. Standards applicable to the initial stop

Both Article 1, § 17 of the Idaho Constitution and the Fourth Amendment to the United States Constitution prohibit unreasonable searches and seizures. A warrantless search or seizure is presumptively unreasonable unless it falls within certain special and well-delineated exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564, 575–76 (1971); *State v. Ferreira*, 133 Idaho 474, 479, 988 P.2d 700, 705 (Ct.App.1999). In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court created a stop-and-frisk exception to the Fourth Amendment warrant requirement. The stop is justified if there is a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911; *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644 (1998); *Ferreira*, 133 Idaho at 479, 988 P.2d at 705. The lawfulness of a search is to be determined by the court, based upon an objective assessment of the circumstances that confronted the officer at the time of the search. *See State v. Murphy*, 129 Idaho 861, 863, 934 P.2d 34, 36 (Ct.App.1997); *State v. Shepherd*, 118 Idaho 121, 124, 795 P.2d 15, 18 (Ct.App.1990).

##### 2. Reasonable suspicion for the initial stop

At 1:39 a.m. on April 15, Officer Benkula received a radio message informing him that a Hispanic-looking male, five foot seven

inches tall, between twenty-five and thirty years old with a Fu–Manchu style mustache and a tall—six feet or more—thin, white male, possibly in a blue hooded sweatshirt, had just robbed a nearby convenience store. Officer Benkula was advised to watch a near-by intersection along the perimeter of the robbery location and to look for persons matching the description of the suspects. At 1:47 a.m. Officer Benkula observed a gray Chevy Astro van being driven by a Hispanic-looking male with a Fu–Manchu style mus-tache proceed past him. This was the only vehicle Benkula observed after receiving the radio message. As Officer Benkula followed and pulled up beside the van, he saw that the male passenger was a slender looking white male with a ponytail. After following the van for about three miles and requesting, but not receiving, a further description of the white male suspect, Officer Benkula called for backup and conducted a high risk stop of the van to check the identities of the driver and passenger given their proximity to the time and place of the robbery. After the male passenger and driver were ordered out of the van and handcuffed, Officer Benkula looked through the van window and saw the end of a gun barrel protruding from under a coat and another gun without grips on the floorboard of the van. Diaz, the driver, was arrested after a license check revealed that his driv-er's license was invalid. Butcher was arrest-ed on an outstanding warrant from another county and for possession of a concealed weapon.

Butcher argues that the mere fact that the driver of the van, in which he was a passen-ger, matched the description of a reported armed robbery suspect did not justify the stop. We disagree. Officer Benkula was aware that a crime had been committed based on the dispatcher's report. He also had a general description of the two suspects. Within a reasonable proximity to the time and place of the crime, he observed a car—the only car to pass him following the radio report of the robbery—carrying two persons matching the general description of the two robbery suspects.

The instant case is factually similar to that of *State v. Gascon*, 119 Idaho 932, 933, 812 P.2d 239, 240 (1991), in which police were notified of the robbery and given a brief general description of the bank robber—a man approximately five feet four inches, with blonde hair, wearing a baseball cap and jack-et. No description of a getaway vehicle was provided and no one observed the suspect flee in a vehicle. Police positioned them-selves on likely egress routes, creating a roadblock along a portion of the perimeter around the robbery location. There, officers observed passing motorists looking for one matching the suspect's description. As Gas-con's vehicle proceeded into the roadblock, the police were alerted because the driver was thought to be acting suspiciously. After the vehicle was stopped and its driver or-dered to get out, the driver was escorted to the rear quarter panel of the car. Another police officer, at the same time, opened the door on the passenger side. The officer saw the brim of a baseball cap protruding from under the passenger seat. Upon removing the baseball cap, the officer found a jacket. A bag of money was found under the driver's seat. Gascon was charged with robbery. His motion to suppress the jacket, hat, notes and bag of currency was denied. This Court affirmed the district court's denial of Gas-con's motion to suppress, stating that where officers know that a serious crime has just been committed, the question is narrowed to whether there is a reasonable suspicion that the person under observation is connected with the crime. *State v. Gascon*, 119 Idaho 923, 928, 811 P.2d 1103, 1108 (Ct.App.1989). Later, on review, the Idaho Supreme Court held that where "the police have a reasonable belief that a crime has been committed—as was the case here—and they have a basic description of the suspect—as was also the case here—[I.C.] § 19–621 allows them to set up a roadblock on a likely escape route to apprehend the suspect." *Gascon*, 119 Idaho at 933, 812 P.2d at 240.

Although no temporary roadblock was es-tablished in the instant case, we hold that Officer Benkula had reasonable suspicion that a serious felony had been committed and, having observed two persons matching the general description of the suspects in the only car on the road at this late hour, he was justified in conducting a *Terry* traffic stop.

### 3. Detention and search of the van for evidence of the robbery

██ We next hold that because of the nature of the crime—robbery—Officer Benkula was justified in treating the van's male occupants as armed and dangerous and ordering them out of the van and handcuffing them. *Gascon*, 119 Idaho at 934, 812 P.2d at 241. During a lawful traffic stop, the officer may instruct the driver to exit the vehicle or to remain inside. This procedure is within the police officer's discretion and is not otherwise unlawful. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 333, n. 6, 54 L.Ed.2d 331, 337, n. 6 (1977); *State v. Parkinson*, 135 Idaho 357, 363, 17 P.3d 301, 307 (Ct.App.2000). The use of handcuffs may be justified during this investigative stop. Officer Benkula was alone at night, faced with two potential robbery suspects, a situation that any reasonable officer would believe might pose an immediate threat to his or her health and safety. *See State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998) (use of handcuffs during investigatory stop appropriate where suspects' apparent attempt to elude officers and lack of cooperation once stopped justified belief that they posed a danger to officer safety); *State v. Frank*, 133 Idaho 364, 368, 986 P.2d 1030, 1034 (Ct.App.1999).

██ After Diaz and Butcher were handcuffed, Officer Benkula looked through the window in the van's sliding door. With the aid of his flashlight, Officer Benkula observed two empty ammunition clips, a number of loose nine-millimeter cartridges, a small portion of a black gun barrel poking out from under a brown coat on the floor of the van,[1] and an apparently empty silver semi-automatic without handgrips. Thus, Officer Benkula had reasonable suspicion that Butcher and Diaz were potentially dangerous persons, with ready access to firearms, who both appeared to match the general description of the robbers of a nearby convenience store. *See United States v. Boden*, 854 F.2d 983, 994 (7th Cir.1988); *State v. Smith*, 115 Wash.2d 775, 801 P.2d 975, 981 (1990). At this point Officer Benkula had a sufficient basis for detaining Butcher at the scene for about twenty minutes until the convenience store clerk was brought by for eyewitness identification purposes. At no point was Butcher unlawfully detained. Before Officer Benkula entered the vehicle to secure the weapons he knew to be there, as well as to search for those that he could reasonably believe were hidden inside, *see Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201, 1219–21 (1983),[2] the convenience store clerk identified Diaz as looking like one of the robbers and Butcher and Diaz were arrested.[3]

---

1. A weapon is concealed if it is not discernible by ordinary observation. *State v. Button*, 136 Idaho 526, 37 P.3d 23 (Ct.App.2001).

2. In *Long*, the United States Supreme Court focused on the high risk to officer safety present in "roadside encounters between police and suspects" and ruled that:

 [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

 *Id.* at 1049, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). The Court explained that "a *Terry* suspect in *Long's* position [might] break away from police control and retrieve a weapon from his automobile.... In addition, if the suspect is not placed

 under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1051–52, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221. It is clear that both rationales underlying the *Long* Court's conclusion were founded on the vulnerability of a police officer during the course of a close-range investigation in which the defendant has not yet been placed under custodial arrest.

3. At the suppression hearing, Officer Benkula testified that he initiated the stop at 1:51 a.m., and after ordering Diaz and Butcher from the car, handcuffing them and placing them in his patrol car, he observed the presence of the cartridges, clips and two firearms in the van by peering through the open doors and side window with his flashlight. At 2:12 a.m. the convenience store clerk was brought to the scene and identified Diaz as looking like one of the robbers. Diaz and Butcher were arrested at about 2:30 a.m. The van was searched for weapons about twenty minutes later.

The district court ruled that Butcher was lawfully arrested on an outstanding "daytime-only" misdemeanor warrant and for possession of a concealed weapon, thus justifying a search of the automobile under the *Belton* doctrine. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *State v. Charpentier,* 131 Idaho 649, 962 P.2d 1033 (1998). We conclude, however, that the physical descriptions of the robbers radioed to Officer Benkula, the presence of firearms in plain view in the van, and the convenience store clerks identification of Diaz as looking like one of the robbers gave immediate rise to probable cause to search the van for evidence of the convenience store robbery. *See Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419, 428–29 (1970); *State v. Lopez,* 107 Idaho 726, 738–39, 692 P.2d 370, 382–83 (Ct.App.1984). Thus, we hold that Officer Benkulas search of the van was a search based upon probable cause to believe that the van contained instrumentalities and fruits from the convenience store robbery.

Because we conclude that there was probable cause to search the van for evidence of the convenience store robbery, we do not decide whether Butcher could lawfully be arrested on the outstanding Cassia County misdemeanor "daytime-only" warrant or for carrying a concealed weapon. *But see State v. Kysar,* 116 Idaho 992, 994, 783 P.2d 859, 861 (1989).

### 4. Butcher's post-*Miranda* statements after he refused to sign the *Miranda* waiver form

Butcher argues that his post-arrest statements to Special Agent Robinson should have been suppressed because his refusal to sign the *Miranda* waiver form constituted a refusal to waive his *Miranda* rights. We disagree. The mere fact that Butcher refused to sign the *Miranda* waiver form is not dispositive. After Butcher was taken to jail for robbery, Robinson orally advised Butcher of his *Miranda* rights and asked him to sign a waiver form. Before Butcher would sign

the form, he wanted to know what he was going to be questioned about. Robinson explained that he was investigating a murder in Rupert. Thereafter, Robinson told Butcher that a witness had seen him at the Morgan home at the time of the murder.[4] Butcher replied, "They probably did." Robinson then described more of the evidence against Butcher, including a beer bottle at Morgan's residence with his fingerprint on it. Butcher became argumentative, invoked his right to counsel and the interview was terminated. Butcher never signed the written *Miranda* waiver form.

Robinson testified that he did not threaten or cajole Butcher into answering any question; that Butcher was not intimidated or scared during the interview; that questions were not repeated and the interview was not prolonged. The district court ruled that Butcher had voluntarily waived his Fifth Amendment right by asking what Robinson wanted to talk to him about.

*Miranda* rights must be received and understood before there can be a valid waiver. William E. Ringel, SEARCHES AND SEIZURES, ARRESTS AND CONFESSIONS § 28.3(b)(2) (2nd ed.1992). However, as this Court acknowledged in *State v. Brennan,* 123 Idaho 553, 557–58, 850 P.2d 202, 206–07 (Ct.App.1993), *Miranda* does not require a written or express waiver. *See State v. Mitchell,* 104 Idaho 493, 497–98, 660 P.2d 1336, 1340–41 (1983). Butcher's inquiry about what Robinson wanted to know constituted a waiver of his right to remain silent and an invitation to the detective to ask questions. The record supports the district court's finding that Butcher's response to questioning was voluntary. Furthermore, questioning stopped when Butcher invoked his right to counsel.

Accordingly, the district court correctly denied Butcher's motion to suppress his jail interview statement.

### III.

### EVIDENTIARY RULINGS

Butcher argues that the district court erred in allowing cross-examination by

---

4. At the hearing on Butcher's motion to suppress, Robinson acknowledged that there was in fact no eyewitness and that use of false information was a well accepted and legitimate interview technique.

the prosecutor that went beyond the scope of the defense's direct examination of Robinson and in not allowing Michael Wiggins to testify that the victim, Morgan, had said Diaz and Rodriguez wanted him dead. On appeal, Butcher cites no authority for his arguments of evidentiary error regarding the cross-examination of Robinson or the exclusion of Wiggins's testimony. Thus, we need not address those issues. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

Butcher also argues that the district court erred in admitting the testimony of Jennifer Ploof on rebuttal that Butcher was with Diaz and Rodriguez on the evening before Morgan's murder. Rebuttal evidence is evidence which explains, repels, counteracts, or disproves evidence which has been introduced by or on behalf of the adverse party. *State v. Floyd*, 125 Idaho 651, 655, 873 P.2d 905, 909 (Ct.App.1994); *State v. Sorrell*, 116 Idaho 966, 968, 783 P.2d 305, 307 (Ct.App.1989). A trial court's decision regarding the admission of evidence in rebuttal will not be overturned unless an abuse of discretion is shown. *See State v. Rosencrantz*, 110 Idaho 124, 129, 714 P.2d 93, 98 (Ct.App.1986).

Jennifer Ploof, a waitress at the Office Bar in Paul, testified that she had known Butcher for over six years and that she had seen Morgan and Butcher separately at the Office Bar on the night of April 9, 1996. Ploof said that Butcher was sitting with four or five Hispanic men and a couple. Prior to her testimony, counsel for Butcher objected to her testimony as being improper rebuttal, arguing that the state was sandbagging the defense by calling a witness that should have been called in the state's case-in-chief. The state countered that Idaho law did not disqualify evidence from rebuttal merely because the evidence *could* have been presented in the state's case-in-chief. The district court ruled that the issue of Butcher's whereabouts on the evening of April 9 came up during the defense's case-in-chief when a witness testified that he had seen Diaz and Rodriguez outside the Office Bar on the night of April 9. The witness said that Rodriguez had displayed a chrome plated handgun and said, "If they mess with me, I'll take

care of them." Thus, Ploof's testimony was probative of the theory that Rodriguez could have had Morgan killed by Butcher and Diaz, and rebuttal to the defense theory that Diaz and Rodriguez shot Morgan.

Accordingly, the district court did not abuse its discretion in admitting Ploof's rebuttal testimony that Butcher had also been present at the Office Bar on the evening of April 9.

## IV.

## JURY INSTRUCTIONS

### A. Standard of Review

The question of whether a jury was properly instructed is a question of law over which this Court exercises free review. *State v. Jones*, 125 Idaho 477, 489, 873 P.2d 122, 134 (1994); *State v. Canelo*, 129 Idaho 386, 391, 924 P.2d 1230, 1235 (Ct.App.1996). When reviewing jury instructions, we ask whether the instructions as a whole, and not individually, fairly and accurately reflect applicable law. *State v. Rozajewski*, 130 Idaho 644, 646, 945 P.2d 1390, 1392 (Ct.App.1997) (citing *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct.App.1993)). Requested jury instructions should not be given if they lack support in the facts of the case or are erroneous statements of the law. *State v. Babb*, 125 Idaho 934, 941, 877 P.2d 905, 912 (1994); *State v. Bronnenberg*, 124 Idaho 67, 71, 856 P.2d 104, 108 (Ct.App.1993).

The trial court must instruct the jurors on all matters of law necessary for their information. If the court deems a requested instruction correct and pertinent, the instruction must be given; if not, it must be refused. I.C. § 19-2132(a). If the instructions given, considered as a whole, fairly and accurately present the issues and state the applicable law, then no error is committed. *State v. Miller*, 130 Idaho 550, 551–552, 944 P.2d 147, 148–49 (Ct.App.1997); *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct.App. 1993).

### B. The Aiding And Abetting Instruction

Butcher argues that the information charged him as a principal and that the

district court erred in subsequently instructing the jury that Butcher could be guilty either as a principal or for aiding and abetting. The information charged Butcher with murder in the first degree in violation of I.C. § 18–4001, by:

> Acting as a principle [sic] thereto (I.C.18–204), then and there knowingly, willfully, unlawfully, intentionally, feloniously and deliberately with premeditation and malice aforethought, and the intent then and there had to kill and murder one Blake Morgan, with a certain deadly weapon, to wit a 9mm semi-automatic handgun, which he then and there held in his hands, and did then and there willfully, unlawfully, knowingly, intentionally, feloniously and of his own deliberate and premeditated malice aforethought with intent to kill and murder the said Blake Morgan, a human being, as aforesaid, by shooting and mortally wounding said Blake Morgan, from which mortal wound he sickened and died at his residence at 207 Maple, Rupert, Minidoka County, Idaho, on or about the 10th day of April, 1996.

At the instruction conference, counsel for Butcher argued that the unamended language of the information charging Butcher with being the shooter bound the state. The district court disagreed and instructed the jury on aiding and abetting.

This Court has previously approved a jury instruction on accessory liability in circumstances that appear indistinguishable from this case. In *State v. Wheeler*, 109 Idaho 795, 711 P.2d 741 (Ct.App.1985), the information alleged that Wheeler personally shot and killed the deceased, and the State presented evidence to support that theory. Based upon additional evidence that Wheeler had been accompanied by another man who could have been the one who fired the weapon, the district court instructed the jury that it could also find Wheeler guilty of aiding and abetting the murder. On appeal, Wheeler argued he had not been given notice that he could be found guilty of aiding and abetting the offense. This Court rejected Wheeler's argument, noting that I.C. § 19–1430 has abolished any distinction between principals and aiders and abettors and makes all parties involved in the commission of a felony culpable as principals. *Wheeler*, 109 Idaho at 796, 711 P.2d at 742. We also acknowledged the Idaho Supreme Court's decision in *State v. Ayres*, 70 Idaho 18, 211 P.2d 142 (1949), holding that where the evidence shows the defendant was an accessory to the charged crime, there is not a fatal variance between the proof at trial and the allegations of the information charging the defendant as a principal. Relying upon the *Ayres* rationale, we held that, "if an accused is fully advised of the acts he is charged with committing, 'he is presumed to know that he would be a principal and guilty as such whether he directly committed the acts charged or aided and abetted in their commission by another.' " *Wheeler*, 109 Idaho at 796, 711 P.2d at 742 (quoting *Ayres*, 70 Idaho at 27–28, 211 P.2d at 147).

We conclude that Butcher was not prejudiced by the state's decision to seek an aiding and abetting instruction because I.C. §§ 18–204 and 19–1430 have eliminated any legal distinction between the culpability of principals and aiders and abettors. Furthermore, the language in the information particularly describing Butcher as the shooter is mere surplusage. In *Miller v. State*, 135 Idaho 261, 266, 16 P.3d 937, 942 (Ct.App.2000) (citing *State v. Headlee*, 121 Idaho 979, 981, 829 P.2d 869, 871 (Ct.App.1992)), this Court reiterated that, "where the language of the indictment or information goes beyond alleging elements of the crime, it is mere surplusage that need not be proved. However, the inclusion of surplusage must not be allowed to prejudice a defendant in the context of his case." Butcher does not point to any particular prejudice, only that he should have been entitled to rely on the language of the information. We conclude that Butcher was not prejudiced by the inclusion of language indicating that he was the shooter. Additionally, we note that the information expressly referenced I.C. § 18–204, which defines principals as both the perpetrators of the criminal act and those who aid or abet the perpetrator. The aiding and abetting instructions were consistent with the evidence presented at trial, which fully supported Butcher's guilt under an accomplice theory.

The district court did not err in giving an aiding and abetting instruction to the jury.

## C. Other Jury Instruction Issues

Butcher argues that jury instruction 7 confused the jury and that the district court erred in refusing to clarify the meaning of "engaged in conduct" as used in that instruction. The district court read instruction 7 as follows:

In order for the defendant to be found guilty of murder, the State must prove each of the following: No. 1, on or about April 10th, 1996, in the state of Idaho, the defendant, Kody Shane Butcher, engaged in conduct which caused the death of Blake Morgan.

. . . .

No. 4, the defendant acted without justification or excuse and with malice aforethought. If you find that the State has failed to prove any of the above, then you must find the defendant not guilty of murder. If you find that all of the above have been proven beyond a reasonable doubt, then you must find the defendant guilty of murder. If you find the defendant guilty of murder, then you must decide if the defendant is guilty of first degree murder.

The general text is that of the pattern jury instruction, ICJI 704, which is an introductory instruction specifically addressing the elements of first and second degree murder and manslaughter. In that instruction, the term "engaged in conduct" refers to the specific criminal acts addressed in subsequent instructions on the specific homicide offense charged and any lesser-included offenses. As applied to the instant case, "engaged in conduct" refers both to shooting Morgan or any act constituting aiding and abetting. As such, it is neither confusing nor in need of clarification to the jury. Because instruction 7 does not misstate the law, we reject Butcher's claim that the "engaged in conduct" language confused the jury.

Regarding aiding and abetting in particular, the district court instructed the jury that: "One who aids and abets a crime is guilty as a principal. However, aiding and abetting requires some proof that the accused either participated in or assisted, en-

couraged, solicited, or counseled in the crime." During deliberations the jury sent a note to the court asking: "Would an individual who aids and abets (participating, assisting, encouraging, etc.) a crime be considered to have engaged in conduct which causes the death of a human being?" The jury also asked what "principal" and "guilty as a principal" meant. The court addressed the jury in the presence of counsel:

Now with regard to the other question that you have asked me—and I won't read the entire sheet, but it ends up with: "What does 'as a principal' mean?"

Courts are reluctant to start defining terms or to go beyond the original instructions they give. And so I'm going to ask you to go back and re-read the instructions that I've given you.

I use the word "reluctant." I didn't say "no." I just say "reluctant." I'm going to ask you to go back and work with what you've got, and we'll go from there.

Counsel did not object to the court's statement to the jury. The jury continued deliberations and reached a verdict—guilty of first degree murder—without any apparent need for clarification by the district court.

Butcher has failed to point to any error in the aiding and abetting jury instruction.

## V.

## MOTION FOR NEW TRIAL

## A. Standard Of Review

When reviewing a trial court's ruling on a motion for new trial, this Court applies an abuse of discretion standard. *State v. Davis*, 127 Idaho 62, 896 P.2d 970 (1995). A trial court has wide discretion to grant or refuse to grant a new trial, and on appeal this Court will not disturb that exercise of discretion absent a showing of manifest abuse. *State v. Olin*, 103 Idaho 391, 648 P.2d 203 (1982). *In State v. Hedger*, 115 Idaho 598, 768 P.2d 1331 (1989), this Court set out the test for evaluating whether a trial court has abused its discretion:

(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason.

*Id.* at 600, 768 P.2d at 1333 (quoting *Associates Northwest, Inc. v. Beets,* 112 Idaho 603, 605, 733 P.2d 824, 826 (Ct.App.1987)).

## B. Discussion

Butcher argues that trial errors individually and under the cumulative error doctrine entitled him to a new trial. As set forth above, Butcher's alleged trial errors were not errors at all. Application of the cumulative error doctrine is predicated on the finding of error in the first instance. *State v. Medina,* 128 Idaho 19, 29, 909 P.2d 637, 647 (Ct.App. 1996). Accordingly, there was not error in the first instance, let alone cumulative error. Butcher was not entitled to a new trial based upon the issues discussed above.

Butcher also argues that he was entitled to a new trial based on newly discovered evidence—a second videotaped interview with jailhouse informant Todd Maas. The second Maas videotaped interview contained a statement by Maas that Butcher had been involved in the killing of a woman named Regina Krieger, unrelated to the murder of Blake Morgan.

A motion for a new trial based specifically on newly discovered evidence, as here, must satisfy all of the following tests: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) it will probably produce an acquittal; and (4) failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *State v. Drapeau,* 97 Idaho 685, 691, 551 P.2d 972, 978 (1976); *State v. Palin,* 106 Idaho 70, 76, 675 P.2d 49, 55 (Ct.App.1983). Impeachment evidence is offered to attack the credibility of the witness rather than to establish the existence or nonexistence of a disputed fact.

Butcher sought to use the second Maas interview videotape to attack Maas's credibility by showing that he had lied in implicating Butcher in the Krieger murder, and therefore raised an inference that Maas also lied in implicating Butcher in the murder of Morgan. It had no other purpose. The district court concluded that Butcher failed to meet the second and third prongs of the *Drapeau* test. We agree. The second Maas interview tape was merely impeaching. Furthermore, it was not likely to produce an acquittal, given Butcher's admission to being at Morgan's home at the time of the murder and the other evidence against him. Finally, the tape was merely cumulative to the testimony of a detective and several inmates already in the record indicating that Maas was a habitual liar. We hold that the district court did not abuse its discretion in denying Butcher's motion for a new trial.

## VI.

## EXCESSIVE SENTENCE

Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *Hedger,* 115 Idaho at 604, 768 P.2d at 1337. A sentence may constitute a clear abuse of discretion if it is unreasonable upon the facts of the case. *State v. Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), overruled on other grounds by *State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992).

[A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view

of the facts, his sentence was excessive in light of the foregoing criteria.

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405 (quoting *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982)). Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App. 1982).

 Butcher, twenty-two years old at the time of sentencing, argues that the fixed life sentence was excessive in light of his rehabilitative potential and lack of a diagnosis of being a sociopath. Butcher argues that the district court's sentencing conclusions that his history of heavy drug and alcohol use created an unacceptable risk of continued abuse, that he would gravitate toward the criminal element and would kill again, were contrary to the evidence presented at sentencing.

At the sentencing hearing, counsel for Butcher presented the testimony of Richard Smith, a psychologist, indicating that Butcher has a narcissistic personality, is of average intelligence and is not a sociopath, i.e., a person beyond rehabilitation. Smith testified that Butcher told him that Morgan had abused Angie Lara, Diaz's cousin, so Butcher and Diaz kicked in the door to Morgan's home to scare him, but Diaz shot Morgan with the .357 revolver he carried and then, at Diaz's command, Butcher fired his nine-millimeter pistol into Morgan a couple of times. Butcher also admitted to committing the convenience store robbery being investigated the night he and Diaz were arrested. Dr. Richard Worst, a psychiatrist appointed by the court, testified that Butcher has an antisocial personality disorder, but that substance abuse could cause a person to behave like someone with an antisocial personality. Worst also testified that Butcher said he and Diaz had a general agreement that if one ever shot someone, the other would shoot too. In allocution, Butcher said that he did not intend to kill Morgan when he kicked in the door, blaming his conduct on the social environment he was in. He also expressed regret for his crime.

Butcher's criminal record reflects a conviction for the convenience store robbery and numerous misdemeanor offenses for motor vehicle and property offenses. Butcher dropped out of high school his junior year and never completed his G.E.D. Butcher began abusing methamphetamine, alcohol, LSD, marijuana, cocaine, and heroin at age thirteen and continued to do so "as often as possible." Butcher admitted to consuming marijuana while in custody and reported that he does not have a problem with drugs, but would like treatment.

At the time of sentencing, the district court noted that Butcher's story of the crime, as he explained it to Drs. Smith and Worst, was not believable. After considering the goals of sentencing, the court stated that Butcher lacked remorse, that his criminal conduct had escalated to murder, that he is a killer, and that there was a risk to society he would kill again. The court also stated that Drs. Smith and Worst had agreed that Butcher could only be rehabilitated if he remained drug free and did not associate with people like Rodriguez and Diaz and that Butcher could not do so. Citing the need to protect society from Butcher, the district court imposed a fixed life sentence.

The "primary consideration is, and presumptively always will be, the good order and protection of society." *State v. Moore,* 78 Idaho 359, 363, 304 P.2d 1101, 1103 (1956). In *State v. Eubank,* 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App.1988), this Court stated that a determinate life sentence may be reasonable "if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence." Given that this was a senseless execution-style killing of a sleeping victim, the district court did not abuse its discretion in concluding that the murder of Blake Morgan was such a crime. *See State v. Williams,* 135 Idaho 618, 620–21, 21 P.3d 940, 942–43 (Ct.App.2001).

## VII.

## CONCLUSION

The district court's orders denying Butcher's motion to suppress evidence and motion

for a new trial are affirmed. The judgment of conviction and sentence are also affirmed.

Judge LANSING and Judge Pro Tem BAIL concur.